FORGEY, District Judge,
coneurmng in part and dissenting in part,
[T45] I concur with the majority to the extent that it affirms the district court's interpretation of the Riva Ridge covenants' "landscaping provision," but I otherwise respectfully dissent.
[¶46] In my opinion, the remaining see-tions of the covenants can also, as a matter of law, unambiguously be interpreted in the same way as the district court ultimately interpreted the covenants. It is clear from the plain language of the covenants that: 1) Riva Ridge "contains significant wildlife habitat and is of high scenic and natural value" and the covenants were adopted "to preserve and maintain the natural character and value of the Property for the benefit of all Owners of the Property or any part thereof;" and 2) structures are to be built within a designated area on each Riva Ridge tract "to provide for the maximum privacy and in order to maintain views from: the principal residences on each of the Tracts without buildings or other structures in the foreground," including that "Inlo structure may be so constructed or placed within a building envelope so that it is visible from any principal residence site as designated on Exhibit 'H', or from any principal residence site relocated...."
[¶ 47] These provisions, when read together and in a manner that gives effect to all of the applicable language, require a broader interpretation of the covenants than the interpretation adopted by the majority, There is- no dispute that the drafters of the covenants intended and anticipated that multistory structures up to thirty feet high, such as principal residences, would be built on Riva Ridge tracts.[7] The majority's interpretation focuses on the term "principal resi-denee site" and limits it to a point or points on the ground that largely exclude areas within a properly-built principal residence where one would expect to have a view "without buildings or other structures in the foreground." That interpretation ignores and renders meaningless the other language contained in the same section of the covenants, is contrary to the stated purpose of the covenants, and will derogate the unobstriicted views that all of the Riva Ridge property owners bargained for[8] "Maximum privacy" 'means what the covenants say it does-"views from the principal residences on each of the Tracts without buildings or other structures in the foreground."[9]
*783 [T48] The majority's interpretation will allow the Baker-Steins to build structures on their tract that are visible in the foreground of two other Riva Ridge property owners' principal residences and minimizes the impact that such an interpretation will have on the other Riva Ridge property owners. The Baker-Steins may have less flexibility in Jo-cating their proposed structures than Riva Ridge property owners who have already built structures on their properties, but the instant case is not one in which the covenants, as I interpret them, would deprive the Baker-Steins from using their property as they intend. The design the Baker-Steins submitted to the Riva Ridge Site Committee included a home and detached writer's studio expected to cost between five and six million dollars. As the district court concluded, the Baker-Steins .
are not denied the right to build their home. They are able to build their home if the design is modified to comply with the visibility restriction. Testimony was received that [] only the top one to two feet of the [proposed] home were visible, requiring the home to be either lowered, whether in overall height or by digging in to the site, or moved a few feet to the west.
[¶ 49] I would further find that the district court properly granted summary judgment to the Appellees on the Baker-Steins' breach of contract claim. Even if the Riva Ridge covenants allow the Baker-Steins to pursue such a cause of action in this case, the only evidence of "bad faith" referenced by the majority in holding that "reasqnable minds could differ regarding the [Riva Ridge] Site Committee's motives in denying the Baker-Steing' building permit" and "genuine issues of material fact exist to determine whether the Appellees acted in bad faith on the breach of contract claim" is as follows: 1) the Site Committee "rejected all versions" of the Baker-Steings' building plans because "some of the Baker-Steing' proposed home would be visible from some locations" in two adjoining property owners' constructed homes; 2) this was based on an "incorrect interpretation of the covenants;" 8) a member of the Site Committee that rejected the Baker-Steins' building plans owned property adjoining the Baker-Steins' property and the Baker-Steing' proposed home would be visible from that owner's principal residence; 'and 4) the Site. Committee sought to "amend the Committee by-laws and rules after this litigation commenced." These grounds are insuffi-client, as a matter of law, to establish "bad faith," particularly considering that the Site Committee, in my opinion, relied on a correct interpretation of the covenants in denying the Baker-Steing' building plans. There are, accordingly, no genuine issues of material fact regarding the Baker-Steins' breach of contract claim, and the Appellees are entitled 'to a judgment on the claim as a matter of law.
[¶50] For these feasons, I would affirm the district court in all respects. My analysis differs somewhat from that of the district court, but "we may affirm the district court upon any valid basis appearing in the record." Arnold v. Day, 2007 WY 86, ¶ 14, 158 P.3d 694, 698 (Wyo 2007)

. The covenants contain a "height restriction" and "design standards such as building heights and roof pitches" that according to the district court "would serve to define the approximate spatial location of a prospective building as more than just a point on the ground." Extrinsic evidence confirms this in that the attorney who drafted the covenants acknowledged that a principal residence "would be larger than a one- ° dimensional point on the ground, as a three-dimensional structure up to 30 feet high" and the majority mentions that "all of the other homes in the area are approximately thirty feet tall." Knowing this, the developers initially used the "story poles" to establish home sites, but at that time "there were no roads in the subdivision and [there was] no practical way to erect towers or other equipment to replicate the approximate height of homes"-'"there were practical limits on what the surveyors and engineers could determine when the project was planned" and they simply "could not determine the height and precise locations of houses that would be built in the building envelopes and encompassing the 'designated sites' depicted in Exhibit H."

. For example, the district court found that the "low density and unique scenic qualities of the Riva Ridge tracts results in a uniquely high value for each tract. A neighboring landowner [to the Baker-Steins] ... paid $19 million for their tract with an existing home."

. Indeed, the district court found the covenants to be "an intricate scheme for ensuring that the structures, roads, utilities, and other signs of human presence on each property are hidden, as much as poss1ble, from the other propert1es in the subdivision."